UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JOSEPH MILLER,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )    Case No. 1:12CV15 JCH/FRB
                                  )
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
                                  )
          Defendant.              )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on plaintiff Joseph Miller's appeal of an adverse decision of the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.    Procedural History**

Plaintiff Joseph Miller ("plaintiff") applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), and for Disability Insurance Benefits ("DIB") under Title II of the Act, alleging that he became disabled on December 1, 2006 due to bipolar disorder and hypertension. Plaintiff's applications were denied, and he requested a hearing before an administrative law judge ("ALJ") on his SSI claim, (Tr. 57), which was held on April 15, 2010. (Tr. 27-41). On September 20, 2010, the ALJ issued a decision in which he determined that plaintiff was not disabled under the Act. (Tr. 11-22).

-1-

Plaintiff sought review from defendant agency's Appeals Council, which denied plaintiff's request for review on November 30, 2011. (Tr. 1-3). The ALJ's decision thus stands as the Commissioner's final decision subject to review by this Court under 42 U.S.C. § 405(g).

## II.    Evidence Before The ALJ

A.    Plaintiff's Testimony

During the administrative hearing, plaintiff testified that he was twenty-three years old, had finished the eleventh grade of high school and had not obtained a G.E.D. (Tr. 30). Plaintiff testified that he attended special education classes while in school. (Id.)

Plaintiff was six feet, six inches tall and weighed 330 pounds, which plaintiff said represented a 25 to 30 pound weight gain due to "medicine." (Tr. 32). Plaintiff testified that he had problems reading due to confusion, and had trouble remembering things. (Tr. 30-31). Plaintiff testified that he had tried doing a dishwashing job and working at a feed store in the past, but quit both jobs after a short while to bipolar disorder, anxiety, depression and "mood problems." (Tr. 31).

Plaintiff testified that he could not "remember things from just several minutes ago" and that this caused problems remembering job duties. (Tr. 32). He testified that he was being treated for a bipolar condition, and had symptoms of depression and anxiety. (Id.) He testified that, when he was working, he had to be reminded repeatedly about his job duties. (Id.) Plaintiff

testified that he had depression which was severe sometimes, and that he needed to be at home because he became violent, had suicidal thoughts, cut his wrists, suffered from fatigue, and had trouble dealing with people. (Tr. 32-33). Plaintiff testified that his violent outbursts occurred due to depression and to "things not going right." (Tr. 33). Plaintiff testified that he had symptoms when on medication, but that his symptoms were worse when he did not take medication. (Tr. 34). He explained that, when he was without medication, he was "depressed constantly, 100 percent of the time. More like, outbursts." (Id.) Plaintiff testified that he cut himself on his arms and wrists at times when his symptoms were intense. (Id.)

Plaintiff testified that he occasionally had trouble sleeping, and that he had trouble concentrating, experienced nervousness and shakiness and anxiety, and experienced panic attacks that lasted 20 to 30 minutes and caused chest pain. (Tr. 35-36). Plaintiff explained that he last suffered a panic attack the preceding day while riding in a car. (Tr. 36). He stated that, even when taking medication, he had weekly auditory hallucinations, visual hallucinations that things were coming in the window, and crying spells. (Tr. 36-37).

Plaintiff testified that his medications caused weight gain, involuntary movement of his facial muscles, pulsing sensations in his extremities, and swelling and cramping in his feet. (Tr. 37). Plaintiff testified that standing for 30 to 45 minutes caused swelling in his feet and back. (Tr. 38). Plaintiff

testified that he had hypertension that caused dizziness and a feeling of faintness. (Id.) Plaintiff testified that he had a driver's license, but had chosen to not drive during the past several months, explaining: "I don't want to be in any kind of mood and hurt anyone, and I don't want to put no one else's life in jeopardy in any kind of mood like that. It's just best that I don't." (Id.)

The ALJ then heard testimony from plaintiff's wife, who testified that she hoped "that they find a medicine that will help him get through these anxieties and stuff" and that she wanted her husband to get better. (Tr. 39). She testified that plaintiff had experienced a "bad attack" in the car while she was driving and that she did not think she was a bad driver, but that plaintiff did this with "just about anybody that's driving." (Id.) She testified that plaintiff had trouble interacting with people and stayed home all of the time "because he don't want to get out and get in one of his moods and not be able to go home, or you know, end up hurting somebody or something. It's just, it's just not, it's not safe." (Tr. 39-40). When asked to describe plaintiff's depression, Mrs. Miller testified: "Depression, he gets sad a lot. I try to cheer him up, it's - - you can't cheer this man up for nothing. You know, I love him dearly, you know, I wouldn't change this for the world, he just - - it's just bad to watch him be sad. Because I just want him to be happy." (Tr. 40).

B.   Medical Records

Records from Southeast Missouri Mental Health Center

dated December 19, 2007 indicate that plaintiff was brought to the
emergency room by his wife and parents, who reported a history of
violent behavior and cutting his wrists, and plaintiff had
superficial cuts on his arms. (Tr. 179, 185-87). Plaintiff
reported smoking marijuana on a daily basis, and was evaluated for
outpatient substance abuse treatment. (Tr. 179, 185-87).

Plaintiff stated he was stressed because he could not get
a job due to being on probation for five years following a theft
conviction. (Tr. 179, 183). Plaintiff reported feeling irritable
and frustrated because of it and reported having cut himself that
day, and feeling suicidal. (Id.) Plaintiff reported incidents of
violence between himself and his father, and reported having no
prior mental health services. (Tr. 179). Plaintiff reported
drinking alcohol twice per year. (Tr. 181). According to
plaintiff, he last used marijuana one month ago, but according to
plaintiff's wife, he used marijuana daily. (Id.) Plaintiff
reported that he was unable to get a job due to "legal problems and
criminal background" and that he had a history of working with his
father in heating and air conditioning, but did not get along with
him. (Tr. 180). Plaintiff reported beginning a five-year term of
probation on October 20, 2006 for theft/stealing, and a two-year
term of probation on September 19, 2007 for tampering with a motor
vehicle. (Id.) He reported that his wife also had a history of
charges and could not get a job or apartment, and that they
received food stamps. (Id.)

Records from Advanced HealthCare Medical Center indicate

that plaintiff was seen on February 24, 2008 with complaints of headache over the frontal area of his head. (Tr. 164). A CT scan revealed sinusitis. (Tr. 166). Plaintiff was diagnosed with acute sinusitis, and also with "uncontrolled hypertension," although the records do not indicate that plaintiff's blood pressure was measured. (Id.)

Records from Southeast Missouri Mental Health Center dated April 30, 2008 indicate that plaintiff was not suicidal or homicidal. (Tr. 176). Plaintiff reported having mood swings and wanting medication "for Bipolar." (Tr. 174). Plaintiff stated that he could not keep a job because he got upset at people, and stated that he had stopped taking medication because it was not working. (Id.) He refused to give a sample for drug screening. (Tr. 175).

Plaintiff described his mood as "getting upset when 'I'm told to do things and get a job!'" (Id.) He admitted to marijuana abuse and stated that he threw things when he was upset and was unable to maintain a job, and again that he got upset with his parents because they wanted him to get a job. (Id.) Plaintiff reported having last used marijuana in November of 2007, and that he had attended all of his outpatient therapy sessions and had recently completed therapy, but continued to experience mood swings. (Tr. 170, 172). Plaintiff reported that he had been "just fine" until about one year ago, and could not recall any significant event that could have triggered his mood swings. (Tr. 170).

Records from Rodney Rubi, M.D. indicate that plaintiff was seen on July 7, 2008 for a Department of Transportation physical. (Tr. 209). It is noted that plaintiff had "[n]o complaints." (Id.) Plaintiff denied all of the following: anxiety, depression, sleep disturbances, soft tissue swelling, abnormal appetite, back pain, dizziness, vertigo or fainting, and recent weight change. (Id.) Plaintiff stated that he was "not feeling tired or poorly" and reported taking only blood pressure medication. (Id.) Upon examination, plaintiff was alert and fully oriented, and in no acute distress. (Tr. 209). Physical and neurological examination were normal. (Tr. 210).

Records from Debra Wyatt, LCSW, indicate that plaintiff was seen on August 22, 2008. (Tr. 196). Plaintiff reported that he was six feet six inches tall, and weighed 330 pounds, which represented a fifty pound weight loss. (Id.) He reported that he quit school in the eleventh grade because he "did not like to go to school and was being asked to make up hours from poor attendance in detention and he did not want to do this." (Id.) Plaintiff reported having attended regular education classes. (Id.)

Plaintiff denied a history of using drugs or abusing alcohol. (Tr. 196). Plaintiff reported working with his father in a heating and cooling business. (Id.) He reported taking medication for hypertension and stated that he had taken medication for manic depression in the past, but did not like it. (Tr. 195-96). Plaintiff reported that he had obtained a "CDL" (Commercial Driver's License), and wanted to be a driver locally. (Tr. 195).

Ms. Wyatt noted that plaintiff had a depressed mood and flat affect. (Tr. 197). Plaintiff's mental functioning was normal, including intact remote and immediate memory, and logical and organized thought processes. (Id.) Ms. Wyatt diagnosed plaintiff with major depressive disorder, assessed his Global Assessment of Functioning ("GAF") score as 51-60,[1] and recommended outpatient therapy. (Tr. 197-98).

Plaintiff returned to Ms. Wyatt on August 29, 2008 and reported feeling less sad and experiencing periods of joy. (Tr. 194). Ms. Wyatt noted that plaintiff's mood and affect had improved since she last saw him and that plaintiff reported feeling better but staying home for the most part. (Id.) Plaintiff reported feeling uncomfortable around people, and that his best friend was his wife. (Id.)

On October 9, 2008, plaintiff was seen at Wayne Medical Center with complaints of chest pain and migraine headache. (Tr. 314). He reported that he had been smoking for two years. (Id.) Upon examination, it was noted that plaintiff had no back pain, anxiety, confusion, hallucinations, sadness, or suicidal ideation.

_____

[1]The Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). GAF scores of 31 to 40 represent some impairment in reality testing, or serious impairment in several areas such as work or school, family relations, judgment, thinking, or mood; GAF scores of 41 to 50 represent serious symptoms or impairment in social, occupational or school functioning; GAF scores of 51 to 60 represent moderate symptoms or difficulty in those areas; and scores of 61 to 70 represent mild symptoms with a reasonably good level of functioning. Id. at 32.

(Id.)  He was found to be in no acute distress.  (Id.)
Neuropsychiatric examination revealed intact recent and remote
memory, and normal mood and affect.  (Tr. 315).  He had no muscle
spasm in his spine.  (Id.)  Blood work, ECG, and chest x-ray were
ordered.  (Tr. 315-16).

Records from Talia Haiderzad, M.D., of the Family
Counseling Center indicate that plaintiff was seen on October 20,
2008 for a psychiatric evaluation.  (Tr. 202).  Plaintiff reported
that he had been diagnosed with bipolar disorder, and was
experiencing mood swings, anxiety, insomnia, and depression for the
last six months.  (Id.)  Plaintiff reported financial stress,
stated he was unable to work, and had been fired due to "depression
and mood swings."  (Id.)  He reported only one suicide attempt, in
December of 2008, and stated he had been hospitalized but did not
want to stay.  (Id.)  He reported smoking cigarettes.  (Tr. 202).
Plaintiff reported that his sister had been diagnosed with
depression and bipolar disorder, and was receiving disability.
(Tr. 203).  Plaintiff reported that he had a high school education,
that he used to work in a feed store but was not working currently,
that he had a couple of close friends, and that he was involved
with church and had had a happy childhood.  (Id.)  Plaintiff
reported experiencing hallucinations in the past.  (Id.)  Dr.
Haiderzad noted that plaintiff's affect was neutral to restricted,
and that he was alert and oriented with average intellect and fair
attention and concentration.  (Id.)  Dr. Haiderzad noted that
plaintiff's memory was intact, and that plaintiff had fair insight

and judgment. (Id.) She diagnosed plaintiff with bipolar disorder by history, type II. (Tr. 204, 255). Dr. Haiderzad wrote that she discussed the option of outpatient counseling for plaintiff, but that plaintiff stated he did not feel he needed it. (Tr. 204).

Plaintiff returned to Dr. Rubi on November 3, 2008 with complaints of a productive cough, ear pain, and nasal congestion, and also seeking a refill of blood pressure medication. (Tr. 211). Plaintiff's blood pressure was 124/80. (Id.)

On December 1, 2008, plaintiff saw Dr. Haiderzad and reported a lot of anxiety, trouble sleeping, and mood swings. (Tr. 308). Upon examination, Dr. Haiderzad noted that plaintiff described his mood as "ok, it's up & down." (Id.) Dr. Haiderzad noted that plaintiff's affect was neutral, and that his memory was intact. (Id.)

On December 10, 2008, Marsha Toll, Psy.D., completed a Mental Residual Functional Capacity Assessment form. (Tr. 221-23). Dr. Toll opined that plaintiff was "moderately limited" in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday/work-week without interruptions from psychologically based symptoms and at a consistent pace without an unreasonable number and length of rest periods, and accept instructions and respond appropriately to criticism. (Tr. 221-22). Dr. Toll found that plaintiff was "not significantly limited" in all other areas. (Id.) Dr. Toll noted that plaintiff did not drive or pay bills due to mood swings. (Tr. 221). Dr. Toll found plaintiff's allegations to be partially

credible, and that, while plaintiff did have some limitations, his medical records showed that he improved when he was compliant with treatment and was capable of performing 1-2 step jobs on a sustained basis away from other people. (Tr. 223). In her Psychiatric Review Technique form completed this same date, Dr. Toll opined that plaintiff had "moderate" limitations in his ability to maintain social functioning and concentration, persistence or pace, but "mild" or no limitations in all other areas. (Tr. 232).

On December 30, 2008, plaintiff saw J. Michael Hoja, M.D., with complaints of insomnia, anger episodes, and agoraphobia. (Tr. 236). Upon examination, Dr. Hoja found that plaintiff exhibited depression and anxiety, but that physical and neurological examination was otherwise normal, including intact recent and remote memory. (Id.) Dr. Hoja wrote that plaintiff was "bipolar and unable to work x 1 year." (Tr. 237).

On January 5, 2009, plaintiff returned to Ms. Wyatt and reported that he was often isolating himself to avoid arguments and conflict. (Tr. 299). Plaintiff reported not sleeping well. (Id.)

From February 6, 2009 to June 5, 2009, plaintiff saw Dr. Hoja on a monthly basis for medication refills, and also reported pain in his wisdom teeth. (Tr. 248-52). Plaintiff reported that his medications were helping, (Tr. 252), and that he tolerated them well. (Tr. 250). He reported that he was seeing a dentist. (Tr. 249).

Also on June 5, 2009, Dr. Hoja completed a Mental Medical

Source Statement form.   (Tr. 243-45).   Dr. Hoja opined that plaintiff was either "moderately" or "markedly" limited in every aspect of understanding and memory, sustained concentration and persistence, social interaction, and "adaption." (Id.) Dr. Hoja checked "no" when asked whether plaintiff had a history that included drug and/or alcohol abuse or addiction.  (Tr. 243).  Dr. Hoja wrote that he first evaluated plaintiff on December 30, 2008 and last evaluated him on June 5, 2008, and that the form covered the period from December 30, 2008 to June 5, 2008.[2]  (Tr. 245).

On October 27, 2009, plaintiff was seen for an evaluation by Ryan VanWinkle, M.S., L.P.C. and Bridget Hurt, Psy.D.  (Tr. 319-25).  When plaintiff was asked about his reasons for obtaining the evaluation, plaintiff stated that his Medicaid insurance was under review.   (Tr. 319).   Plaintiff reported two psychiatric hospitalizations, in December 2007 and May 2008, due to anxiety. (Id.) He reported having been diagnosed with bipolar mood disorder and "severe depression," and also reported hypertension, a heart murmur, and problems with two vertebral discs and corresponding back pain.  (Id.)

Plaintiff reported that he had been able to sleep "pretty good" for the past nine months, and that he suffered insomnia prior to this because his mind raced and he worried about bills and other things.  (Tr. 319).  Plaintiff did not report disordered eating behaviors, and instead reported that his appetite was good and

_____

[2]The form is dated June 5, 2009, and Dr. Hoja presumably meant to indicate this date rather than June 5, 2008.

that his weight was stable at 330 pounds. (Id.) Plaintiff reported that his memory was good but that he had trouble concentrating, and often had to read things over in order to comprehend them. (Id.) Plaintiff reported that his energy level was low, and that he "never really had a whole lot of energy." (Id.) He stated that his mind raced when he tried to go to sleep or when he was already feeling upset. (Tr. 319). He reported impulsiveness with anger outbursts but no other instances of out-of-control behavior. (Tr. 319-20). Plaintiff reported an increase in goal-directed activities which he said was why he often could not sit still. (Tr. 320). Plaintiff reported that he would "get up and clean, etc., and begin a number of tasks without finishing any of them." (Id.) Mr. VanWinkle and Dr. Hurt noted that plaintiff was able to sit still through the interview and, when this was pointed out to him, plaintiff replied "I don't got nothing to do in here." (Id.)

Anger outbursts were noted as a "figural element" of plaintiff's symptom narrative. (Id.) Plaintiff reported getting angry over little things, and even waking up angry. (Tr. 320). Plaintiff reported episodes of increased irritability as "hours long" and were addressed by isolating himself and eating. (Id.) Plaintiff reported having done well in school and earning average grades. (Id.)

Plaintiff reported frequent irritability but reported that "this is at a much lowered intensity than that felt prior to medication therapy." (Id.) He reported feeling sad "pretty much

-13-

every day" and reported frequent tearfulness. (Tr. 320).
Plaintiff reported that feelings of worthlessness and suicidal
ideations had abated with medication. (Id.) Plaintiff smiled and
opined that his former self-mutilating behavior was "stupid," and
reported no psychotic symptoms or delusional thought processes.
(Id.) Mr. VanWinkle and Dr. Hurt wrote that "[a]nger is not
currently preventing him from working and is not causing serious
relational difficulties with his wife." (Id.)

Plaintiff reported social discomfort and a dislike of
crowds, but denied feeling stared at or talked about by others, and
reported being able to function socially when he chose to. (Tr.
320). Plaintiff reported financial worries, stating "[t]here's no
extra money for us to go out and do anything" and "[w]e're stuck at
home all the time." (Id.) Plaintiff reported discrete episodes of
anxiety accompanied by anger and characterized by difficulty
breathing, a feeling that his heart would beat out of his chest,
feeling numb, and difficulty moving. (Id.) Plaintiff reported
that the duration of these episodes was around ½ hour. (Id.)
Plaintiff denied obsessions and compulsions. (Tr. 320). Plaintiff
denied alcohol or substance use. (Id.) Plaintiff reported that
his father had serious problems controlling his anger and that
plaintiff avoided him. (Id.) Plaintiff stated "[w]e can not work
together; it's not possible." (Tr. 320-21).

Plaintiff reported a "pretty good" childhood, and
reported that he did well in school, and also reported that he
graduated from Bismarck High School in 2005. (Tr. 321). Plaintiff

reported that he was arrested once at his father's behest after becoming angry while the two were working together. (<u>Id.</u>) Plaintiff stated that his father had "always been irritable" and that he avoided working with his father. (<u>Id.</u>) Plaintiff then noted that these difficulties applied only to work relationships, and that he was able to go hunting and fishing with his father without incident. (<u>Id.</u>)

Plaintiff reported that his wife was working at present, but that they were experiencing economic strain because plaintiff had "been unemployed for the past month." (Tr. 321). Plaintiff stated that he would "like to get a good job somewhere" but did not have any specific goal or plan. (<u>Id.</u>)

Plaintiff reported that he had been unemployed for the past month due to the "seasonal nature" of his work. (<u>Id.</u>) Plaintiff reported that he had been helping his wife, who managed a marina on Clearwater Lake. (<u>Id.</u>) He reported having trouble maintaining employment due to anger, but denied ever being fired, although plaintiff did say that his father told him, "[i]f you can't be around anybody you might as well not work," which was tantamount to being fired. (Tr. 321).

Upon examination, Mr. VanWinkle and Dr. Hurt noted that plaintiff's mood was mildly dysphoric and that plaintiff related mild social anxiety but not at a clinically significant level. (Tr. 322). Mr. VanWinkle and Dr. Hurt noted that symptoms of generalized anxiety, posttraumatic stress, and other symptoms were denied, and that plaintiff reported no alcohol or drug abuse.

-15-

(Id.)  Plaintiff was alert and fully oriented with a fair fund of knowledge.  (Id.)  Mr. VanWinkle and Dr. Hurt noted that plaintiff appeared to become frustrated easily with resultant irritability, but could spell "world" forward and backward on his first attempt. (Id.)  Plaintiff's intelligence was estimated as falling in the normal range, with poor insight but intact judgment.  (Tr. 322). Plaintiff was diagnosed with major depressive disorder, single episode, in partial remission, anxiety disorder not otherwise specified.  Bipolar disorder was listed as a rule out diagnosis due to episodes of anger and his reported late onset of such episodes. (Id.)

     Mr. VanWinkle and Dr. Hurt noted that, aside from those factors, plaintiff's narrative did not support a diagnosis of bipolar mood disorder.  (Tr. 322-23).  Mr. VanWinkle and Dr. Hurt speculated regarding whether plaintiff's presentation was consistent with repressed past trauma.  (Tr. 323).  Mr. VanWinkle and Dr. Hurt opined that plaintiff's description of panic-like episodes did not meet criteria for panic attack, and were viewed in part as symptoms of heightened arousal accompanying strong anger. (Id.)  Mr. VanWinkle and Dr. Hurt opined that plaintiff's anger outbursts were not sufficiently violent to warrant a diagnosis of Intermittent-Explosive Disorder.  (Id.)  They explained that Anxiety Disorder not otherwise specified was added as a diagnosis because plaintiff's panic-like symptoms suggested a pathology that did not clearly meet criteria for other anxiety disorders.  (Id.) Mr. VanWinkle and Dr. Hurt noted that, while plaintiff reported

difficulties with distractibility, concentration, and sitting, these were not viewed as indicative of Attention Deficit/Hyperactivity Disorder. (Tr. 323). Mr. VanWinkle and Dr. Hurt recommended that plaintiff continue medication therapy and perhaps undergo psychotherapy to explore childhood issues. (Id.) On November 18, 2009, Dr. Hurt completed a Missouri Department Of Social Services, Family Support Division form indicating her opinion that plaintiff was disabled for six to 12 months. (Tr. 324-25).

On December 8, 2009, plaintiff saw Paul Rains with complaints of right-sided thoracic pain, cough, chills, malaise, sore throat, lower back pain, headache, and anxiety, all worsening over the past week. (Tr. 266). Plaintiff reported that he had "been in generally fair to good health all of his lifetime." (Id.) He reported chronic anxiety and depression, and stated that he tended to wake in the middle of the night and have trouble going back to sleep. (Tr. 265). Dr. Rains diagnosed plaintiff with an acute upper respiratory infection and bronchitis, chronic lumbar pain, anxiety and depression, poor sleep patterns, and morbid obesity. (Id.) Plaintiff was given a sleep aid, an antibiotic, and a decongestant. (Tr. 264).

On January 8, 2010, plaintiff saw Dr. Rains with complaints of back pain. (Tr. 261). Plaintiff was tender on palpation, and muscle spasm was present. (Id.) Plaintiff was given prescription medication. (Id.)

On March 30, 2010, plaintiff saw Dr. Rains with

complaints of sore throat and cough. (Tr. 310). He was diagnosed with an upper respiratory infection. (Id.)

On April 8, 2010, Dr. Hoja completed another Mental Medical Source Statement form. (Tr. 304-06). Dr. Hoja opined that plaintiff was "not significantly limited" in his ability to: understand, remember, and carry out very short and simple instructions; make simple work-related decisions; and ask simple questions or request assistance. (Tr. 304-05). Dr. Hoja opined that plaintiff was either "moderately" or "markedly" limited in every other aspect of understanding and memory, sustained concentration and persistence, social interaction, and "adaption." (Id.) Dr. Hoja checked "no" when asked whether plaintiff had a history that included drug and/or alcohol abuse or addiction. (Tr. 304). Dr. Hoja wrote that he first evaluated plaintiff in 2008 and last evaluated him on April 8, 2010, and that the form covered that period of time. (Tr. 306).

### III.    The ALJ's Decision

The ALJ in this case determined that plaintiff had not engaged in substantial gainful activity during the relevant time period, and that he had the following impairments: obesity, minimal scoliosis of the lumbosacral spine, hypertension controlled by medication, and infrequent medical attention and treatment for a presumed bipolar disorder, major depressive disorder, and/or anxiety disorder not otherwise specified. (Tr. 21). The ALJ noted that, given plaintiff's minimal work history, he had no past relevant work. (Id. at n. 3). Citing Polaski v. Heckler, 739 F.2d

1320, 1321-22 (8th Cir. 1984), the ALJ discredited plaintiff's allegations of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of all sustained work activity. (Tr. 15-22). The ALJ determined that plaintiff had only slight abnormalities that did not significantly affect the performance of any basic work-related activities, and therefore did not have a "severe" impairment as defined in 20 C.F.R. § 416.921. (Tr. 22). The ALJ concluded that plaintiff was not under a "disability" as defined in the Act at any time through the date of the decision. (Id.)

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

-19-

work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to a listed impairment, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial

evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, if substantial evidence exists to support the administrative decision, this Court must affirm that decision even if the record also supports an opposite decision.  Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003); see also Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

In the case at bar, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole.  In support, plaintiff argues that the ALJ failed to properly evaluate the credibility of his subjective complaints; improperly rejected his severe impairments; improperly rejected the opinions of Drs. Toll, Hurt, and Hoja, and Mr. VanWinkle which, plaintiff claims, support his allegations; and failed to consider

the impact of his obesity on his mental impairments. Plaintiff
also argues that the ALJ's decision is not supported by some
medical evidence.

     A.   <u>Credibility Determination</u>

       The ALJ in this case determined that plaintiff's
subjective allegations were not fully credible. Plaintiff
challenges this determination, arguing that the ALJ erroneously
considered plaintiff's failure to seek medical treatment; that his
symptoms related to memory problems and trouble being around others
were supported by the records of Drs. Toll and Hoja; and that the
ALJ generally rejected plaintiff's statements without evaluation.
Review of the ALJ's credibility determination reveals no error.

       Testimony regarding pain is necessarily subjective in
nature, as it is the claimant's own perception of the effects of
his alleged physical impairment. <u>Halpin v. Shalala</u>, 999 F.2d 342,
346 (8th Cir. 1993). Because of the subjective nature of physical
symptoms, and the absence of any reliable technique for their
measurement, it is difficult to prove, disprove or quantify their
existence and/or overall effect. <u>Polaski</u> at 1321-22. In <u>Polaski</u>,
the Eighth Circuit addressed this difficulty and established the
following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis
> which supports the degree of severity of
> subjective complaints alleged is just one
> factor to be considered in evaluating the
> credibility of the testimony and complaints.
> The adjudicator must give full consideration
> to all of the evidence presented relating to
> subjective complaints, including the
> claimant's prior work record, and observations

-22-

> by third parties and treating and examining
> physicians relating to such matters as: (1)
> the claimant's daily activities; (2) the
> duration, frequency and intensity of the pain;
> (3) precipitating and aggravating factors; (4)
> dosage, effectiveness and side effects of
> medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he may discount such complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, the ALJ wrote that he had considered all of plaintiff's symptoms and the extent to which they were consistent with the objective medical evidence based upon the requirements of 20 C.F.R. § 416.929 (which, as the ALJ recognized, incorporates and expands upon Polaski) and Social Security Rulings 96-4p and 96-7p. The ALJ also listed the factors to be considered

when evaluating the credibility of subjective complaints. The ALJ analyzed all of the evidence of record, and noted numerous inconsistencies in the record that detracted from plaintiff's subjective allegations of symptoms precluding all work.

The ALJ noted that plaintiff's "very sparse work record" did "nothing to enhance [plaintiff's] credibility as a person who was ever well motivated to work outside of his home, even before allegedly disabling medical impairments set in." (Tr. 15). A poor work history detracts from a claimant's credibility. Pearsall, 274 F.3d at 1218 (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)).

The ALJ also noted that plaintiff may or may not have bipolar disorder, major depressive disorder, generalized anxiety disorder, but had nothing that could be considered a sustained course of mental health treatment. The ALJ noted that plaintiff went to the emergency room for alleged suicidal ideation in December of 2007, but had no documented evidence of further mental health treatment until April of 2008, and then not again until August of 2008. The ALJ also noted that plaintiff saw Dr. Haiderzad only twice and not after December 1, 2008, and that plaintiff did not see Ms. Wyatt again after January 5, 2009. The ALJ noted that there was no documented evidence of further evaluation or treatment for mental illness until plaintiff saw Mr. VanWinkle the single time on October 27, 2009, and none since. The ALJ also noted that plaintiff saw Mr. VanWinkle only due to concern about his Medicaid coverage. The ALJ concluded "[t]his lack of

sustained treatment suggests that the claimant was never serious about getting his mental illness under control, which in turn suggests that it was never all that bad to begin with, even in his own estimation." (Tr. 19).

Plaintiff challenges the ALJ's reliance upon the lack of sustained medical treatment, citing Pate-Fires v. Astrue, 564 F.3d 978 (8th Cir. 2009) in support of his argument that the ALJ erroneously failed to consider whether plaintiff's failure to seek treatment was caused by his mental impairment. In Pate-Fires, the claimant suffered from a severe schizoaffective disorder that caused many symptoms, including complete denial of her illness. Id. at 946. Despite overwhelming evidence that her mental illness caused her noncompliance with medication, the ALJ found that her noncompliance was not justified. Id. The Eighth Circuit reversed, holding that the ALJ had failed to recognize that Pate-Fires's noncompliance was a manifestation of her mental illness, and that medical noncompliance was common among those with such illness. Id. at 945.

As the Commissioner contends, Pate-Fires is inapposite to the case at bar. Here, unlike in Pate-Fires, there is no evidence linking mental illness to plaintiff's failure to consistently seek mental health care. See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (distinguishing Pate-Fires on this basis). The ALJ was therefore under no obligation to apply the principles of Pate-Fires to justify plaintiff's failure to obtain regular and sustained mental health treatment, and the undersigned finds that the ALJ

properly considered plaintiff's failure to seek regular mental health treatment as one factor detracting from his credibility. See <u>Novotny v. Chater</u>, 72 F.3d 669, 671 (8th Cir. 1995) (A lack of regular and sustained treatment is a basis for discounting complaints, and is an indication that the claimant's impairments are non-severe).

The ALJ also noted that plaintiff's hypertension improved with medication (Tr. 16-18), and the record also shows that plaintiff told his medical providers that medication improved his mental health symptoms. (Tr. 194, 252, 320). See <u>Wilson v. Chater</u>, 76 F.3d 238, 241 (8th Cir. 1996) (citing <u>Stout v. Shalala</u>, 988 F.2d 853, 855 (8th Cir. 1993)(conditions controlled with medication are not medically severe).

The ALJ also noted plaintiff's demeanor during the administrative hearing, which the ALJ described as displaying "no obvious signs of depression, anxiety, memory loss, or other mental disturbance." (Tr. 20). This was but one factor the ALJ considered in his credibility determination. While not alone dispositive, an ALJ is entitled to consider his or her personal observations of a claimant during the administrative hearing. <u>Johnson</u>, 240 F.3d at 1147-48 (citing <u>Smith v. Shalala</u>, 987 F.2d 1371, 1375 (8th Cir. 1993)("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations").

The ALJ also considered and rejected plaintiff's wife's testimony because, <u>inter alia</u>, she was not medically trained; her

relationship to plaintiff meant she was not a disinterested witness; and her testimony was inconsistent with the preponderance of the medical evidence. An ALJ may discount the testimony of a spouse because a spouse has a financial stake in the outcome of the claimant's case. See Choate v. Barnhart, 457 F.3d, 865, 872 (8th Cir. 2006).

The ALJ noted that, although plaintiff testified that he had gained 25 to 30 pounds due to medication, he testified "that he weighed 330 pounds, which was *less* than what he weighed in all of the medical records dating back to early 2008." (Tr. 18) (emphasis in original). The ALJ concluded that there was thus no evidence that medication caused plaintiff to gain or lose weight. In addition, as summarized above, plaintiff's treatment providers noted that plaintiff reported that his medications were helpful.

In addition to the foregoing, the undersigned notes several inconsistencies between plaintiff's subjective allegations and the evidence of record. When plaintiff saw Dr. Rubi on July 7, 2008 for a Department of Transportation physical, he reported no anxiety, no depression, no sleep disturbances, no soft tissue swelling, a normal appetite, no back pain, no dizziness, vertigo or fainting, no recent weight change, and that he was "not feeling tired or poorly." (Tr. 209). Plaintiff reported taking only blood pressure medication, and had a normal examination. Another example is found in the medical records from Wayne Medical Center, where plaintiff was seen in October of 2008. At that time, he denied anxiety, confusion, and sadness, and his recent and remote memory

were determined to be intact.  The record fails to demonstrate that plaintiff consistently complained of mental health symptoms of the alarming severity he described during the administrative hearing when seeking other medical treatment.  While not alone dispositive, this lends support to the ALJ's adverse credibility determination. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir.1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment).

The record also indicates that plaintiff gave conflicting statements about his education history.  As summarized above, plaintiff testified that he had significant problems with memory and concentration, and testified that he needed constant reminders regarding job duties.  Plaintiff also testified that he did not complete high school, and had attended special education classes while in school.  However, in August of 2008, he told Dr. Wyatt that he had attended regular education classes while in school (Tr. 196); in October 2008 he told Dr. Haiderzad that he had a high school education (Tr. 203); and in October of 2009 he told Dr. Hurt and Mr. VanWinkle that he graduated from Bismarck High School in 2005.  (Tr. 321).  Plaintiff also testified that he did not drive due to mood problems and anxiety, and Dr. Toll noted in December of 2008 that plaintiff did not drive due to mood swings.  However, the medical evidence of record shows that plaintiff presented himself for a Department of Transportation physical with Dr. Rubi in July of 2008, and in August of 2008, told Dr. Wyatt that he had obtained a Commercial Driver's License and was contemplating obtaining work

as a local driver.  (Tr. 195).  While certainly not dispositive, this evidence that plaintiff gave inconsistent statements and contemplated work provides some support for the ALJ's adverse credibility determination.  Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (a claimant's inconsistent statements detract from his credibility); see also Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (claimant's contemplation of work as evidenced by his application for jobs during claimed disability period indicates he did not view his symptoms as disabling).

Plaintiff contends that the ALJ improperly rejected Dr. Toll's opinion that he had moderate limitations in terms of memory and social difficulties, and that Dr. Toll's opinion supports his subjective allegations.  Plaintiff also contends that Dr. Hoja "also confirmed Plaintiff's deficits in these areas." (Docket No. 13 at 14).  As summarized above, in December of 2008, the beginning of the relevant time period, Dr. Toll reviewed plaintiff's medical records and opined that plaintiff would have mild limitations in his daily activities, and moderate limitations in social functioning and concentration, persistence, or pace.  The ALJ wrote that he rejected Dr. Toll's opinion in part because she lacked all of the relevant medical records, and instead only reviewed records through October of 2008.  Also, as the ALJ noted, Dr. Toll relied upon plaintiff's subjective allegations in reaching her conclusions, allegations which the ALJ had properly rejected as less than fully credible.  See McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011)("Finally, the ALJ noted that Dr. Puente's

-29-

evaluation appeared to be based, at least in part, on McCoy's self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, Dr. Puente's report was rendered less credible.") Plaintiff can find no real support in Dr. Toll's opinion because it was not based upon medical records from the relevant time period, and because it was based upon plaintiff's subjective allegations which the ALJ had properly discredited.

Plaintiff also claims that Dr. Hoja's opinions support his subjective allegations. The ALJ recognized Dr. Hoja's status as a treating physician, but concluded that his opinions were entitled to "no weight" because they were conclusory, because Dr. Hoja was not a mental health specialist and had treated plaintiff primarily for physical complaints, and because they were inconsistent with other record evidence. (Tr. 16, 19). Substantial evidence supports the ALJ's decision in this regard.

A treating physician's opinion does not automatically control, but the Commissioner will give it controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quotation omitted). A treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record. See Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan, 239 F.3d at 961.

As the ALJ noted and as summarized above, Dr. Hoja

completed forms in 2009 and again in 2010 (after a ten-month gap in treatment) and checked boxes indicating his opinion that plaintiff had moderate or marked limitations in almost all work-related activities, including memory, concentration, persistence, social interaction, and adaption. Dr. Hoja was not a mental health specialist, and his opinion evidence fails to indicate what medically acceptable clinical and laboratory diagnostic techniques he used to reach his conclusions regarding plaintiff's limitations. In addition, Dr. Hoja's opinions are inconsistent with the balance of the medical evidence of record. Plaintiff's medical treatment records indicate that his doctors, including Dr. Hoja, reported that plaintiff's recent and remote memory were intact. (Tr. 197, 203, 236, 308, 315). Consistent with those examination findings, plaintiff told Dr. Hurt and Mr. VanWinkle that his memory was good, (Tr. 319), and he denied all psychologically-based symptoms when he presented to Dr. Rubi for a Department of Transportation physical. Regarding plaintiff's alleged difficulty being around others, which he testified made him want to stay at home all the time, plaintiff reported to Dr. Hurt and Mr. VanWinkle that he had some social discomfort and disliked crowds, but could function socially when he chose to. (Tr. 320). Plaintiff also blamed financial limitations, not psychological symptoms, as the reason he remained at home, stating "[t]here's no extra money for us to go out and do anything" and "[w]e're stuck at home all the time." (Id.) This is inconsistent with plaintiff's testimony that he had trouble being around other people, had violent outbursts, and did not like to

leave the house for these reasons.  The ALJ properly discounted Dr. Hoja's opinion evidence.  See Stormo, 377 F.3d at 805-06; Hogan, 239 F.3d at 961 (A treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record).

Plaintiff also claims that the ALJ improperly rejected the opinion evidence of Dr. Hurt and Mr. VanWinkle, and that it supports his allegations.  As stated above, plaintiff saw Dr. Hurt and Mr. VanWinkle for a consultation because his Medicaid insurance was under review.  Following the consultation, Dr. Hurt completed a Missouri Department Of Social Services, Family Support Division form indicating her opinion that plaintiff was disabled for six to 12 months.  (Tr. 324-25).  While the opinion expressed on the form may have been dispositive for purposes of Medicaid coverage review by the state of Missouri, it was not dispositive in the proceedings before the ALJ.  As the Commissioner correctly notes, "[A] medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (citing Stormo, 377 F.3d at 807).  The ALJ properly considered this opinion and determined that it was not entitled to great weight as it was based upon different legal standards.  (Tr. 18-19).

Plaintiff also contends that his GAF score of 51-60, as assessed by Ms. Wyatt, supports his allegations of severe mental

impairments. However, as the Commissioner correctly notes, while a GAF score can assist the Commissioner in evaluating a claim of disability, neither the Regulations nor precedent require an ALJ to determine the extent of a claimant's mental impairment based upon a GAF score. In fact, the Eighth Circuit has noted that the Commissioner has declined to endorse GAF scores, and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." <u>Jones v. Astrue</u>, 619 F.3d 963, 973 (8th Cir. 2010) (internal citation omitted). "[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." <u>Id.</u> (internal citation omitted). As explained above, the ALJ in this case conducted an exhaustive review of the reports and findings of all of plaintiff's medical care providers, and noted many inconsistencies therein that detracted from plaintiff's credibility. Finally, plaintiff has not pointed to evidence demonstrating a "GAF Score History" indicating that he has been assessed at or below 50 on several occasions. <u>See</u> <u>Id.</u>

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by <u>Polaski</u>, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ also properly evaluated and weighed the medical

evidence of record, and it cannot be said that such evidence detracts from the ALJ's credibility determination. Because the ALJ considered the <u>Polaski</u> factors and discredited plaintiff's subjective complaints for a good reason, that decision should be upheld. <u>Hogan</u>, 239 F.3d at 962.

B. <u>Severity</u>

The ALJ in this case determined that plaintiff had the following impairments: obesity, minimal scoliosis of the lumbosacral spine, hypertension controlled by medication, and "infrequent medical attention and treatment for a presumed bipolar disorder, major depressive disorder, and/or anxiety disorder not otherwise specified." (Tr. 21). The ALJ wrote that there was no evidence that plaintiff had a mental impairment or combination of mental impairments that met or equaled the criteria of any impairment listed in Sections 12.02-12.10 of Appendix 1, pursuant to the mental impairment evaluation required by 20 C.F.R. § 416.920a, and then explicitly addressed the criteria contained therein. (Tr. 20-21). The ALJ also wrote that, even if he determined that plaintiff should be limited to simple, repetitive tasks with no more than infrequent contact with co-workers, supervisors, or the general public, plaintiff would be found not disabled which would be, in the alternative, an unfavorable determination at Step five. (Tr. 21).

Citing <u>Brown v. Bowen</u>, 827 F.2d 311 (8th Cir. 1987), the ALJ determined that plaintiff had "only slight abnormalities not significantly limiting the performance of any basic work

activities" (Tr. 18) and therefore did not have any "severe" impairment or combination of impairments as defined in 20 C.F.R. § 416.921. (Tr. 22). Plaintiff argues that the ALJ held plaintiff to an erroneously high standard in reaching this decision and that, based upon Dr. Toll's opinion, plaintiff has severe mental impairments. Review of the ALJ's decision reveals no error.

Step two of the Commissioner's five-step evaluation process provides that a person is not disabled if his impairments are not "severe." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (internal citation omitted). As plaintiff argues, severity is not an onerous requirement for a claimant to meet. Id.

In Bowen v. Yuckert, the Supreme Court held that step two's threshold severity requirement was not per se invalid. 482 U.S. 137 (1987). In regard to the application of that requirement, however, the majority adopted a standard which provides that "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the sequential evaluation process. Id. at 158. While the standard of proof is low, it "is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." Kirby, 500 F.3d at 707 (internal citation omitted). It is plaintiff's burden to establish that his impairment or combination of impairments is severe. Id.

In support of his argument that the ALJ held him to an improperly high standard of proof, plaintiff points to three

statements from the ALJ's decision: (1) that no mental health specialist found that plaintiff had a "profoundly disabling and untreatable" mental illness; (2) that plaintiff had never been described as "psychotic;" and (3) that plaintiff had no "inpatient hospitalizations" or similar "drastic interventions." (Docket No. 13 at pages 7-9). However, none of these statements suggests that the ALJ held plaintiff to an improperly high standard because none of them were made in the context of considering whether plaintiff met the severity requirements at step two. When the ALJ made the first statement, he was not stating that a person needed to have such a finding in order to meet the severity requirement, but was instead comparing the records of mental health specialists Ms. Wyatt, Dr. Haiderzad and Mr. Van Winkle to the extreme limitations suggested by Dr. Hoja, who was not a mental health specialist. (Tr. 19). When the ALJ made the second statement, he was not stating that a person must be psychotic to meet the severity requirement, but was instead noting inconsistencies between the medical evidence and plaintiff's subjective complaints. (Tr. 20). Regarding the third statement, the ALJ was not suggesting that a person needed inpatient hospitalizations or drastic interventions to meet the severity requirement, but was instead describing the nature of plaintiff's mental health treatment as one factor in his decision. (Tr. 20).

Furthermore, as discussed above, the ALJ's decision was influenced by his determination that plaintiff's allegations were not fully credible, a decision which was supported by good reasons

-36-

and substantial evidence. As explained above, the undersigned defers to the ALJ's credibility determination. <u>See</u> <u>Leckenby v.</u> <u>Astrue</u>, 487 F.3d 626, 632 (8th Cir. 2007) (the court defers to ALJ's credibility determination when it is supported by good reasons and substantial evidence).

Also contrary to plaintiff's arguments, as explained above, the ALJ properly considered and weighed all of the medical opinion and treatment evidence of record in evaluating plaintiff's mental impairments. In addition, the medical evidence demonstrates that plaintiff exhibited no physical limitations. There is no evidence that the ALJ erred, or that he held plaintiff to an improperly high standard, when making his step two determination.

C.   <u>Obesity</u>

Plaintiff states that, in addressing obesity, the ALJ "failed to comply with SSR 02-01p by not considering the 'impact' from obesity on Plaintiff's working ability regarding mental capacities." (Docket No. 13 at page 11-12). Review of the ALJ's decision reveals no error.

In addressing plaintiff's obesity, the ALJ cited SSR 02-01p and wrote:

> The claimant is obese, but his weight never approached the 374 pounds that would be needed to consider him for disability due to obesity even for a man of 76 inches in height, the maximum height cited under Section 9.09 of Appendix 1, Subpart P, Regulations No. 4, in effect until its repeal on October 25, 1999. (The claimant is 78 inches tall, and so presumably would have to weigh even more than 374 pounds under this Section.)   20 CFR 416.920(d).   There is also no credible

> evidence that the obesity, although
> contributing to some diminution in ordinary
> mobility and stamina, reduces the claimant's
> overall functional abilities, either by itself
> or in combination with other medically-
> established impairments in this case, in a way
> that precludes his doing work activity at any
> and all levels of exertion.

(Tr. 16).

Contrary to plaintiff's statements, the ALJ adequately explained that obesity did not impact plaintiff's functional abilities, either alone "or in combination with other medically-established impairments in this case," in a way that precluded the performance of work. (Id.) The ALJ also identified presumed bipolar disorder, major depressive disorder, and/or anxiety disorder not otherwise specified as impairments. It therefore cannot be said that the ALJ failed to address obesity, consider its impact upon his mental impairments, or explain his determination.

Furthermore, plaintiff offers no argument in his briefs that obesity impacted his mental impairments, nor did he testify to any such impact during the administrative hearing. See Forte v. Barnhart, 377 F.3d 892, 896-97 (8th Cir. 2004) (citing Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (There is no evidence that obesity imposed work-related limitations, and plaintiff did not testify that his obesity imposed additional restrictions).

D.   Medical Evidence

In a reply brief, plaintiff argues that "the ALJ's decision regarding medical conditions, and their impact on Plaintiff's ability to work, was based on no medical evidence."

-38-

(Docket No. 19 at page 1).  Plaintiff also states: "[c]ontrary to legal precedent, the ALJ failed to elicit medical opinion to guide the ALJ in forming his decision that Plaintiff had no restrictions, or severe impairments."  (<u>Id.</u> at page 3).

Review of the ALJ's decision shows that he did not ignore any of the medical evidence of record, and discounted opinion evidence that was conclusory and contradictory to the balance of the evidence of record.  To the extent plaintiff claims that the ALJ erred by failing to cite specific evidence to support his decision, the undersigned notes the Eighth Circuit's recent statement that the Court's role is to "review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations[.] ... [W]e do not require an ALJ to mechanically list and reject every possible limitation."  <u>McCoy</u>, 648 F.3d at 615.  While the ALJ did not present his findings in bullet-point format, such a rigid format is not required, as plaintiff seems to suggest.  The ALJ thoroughly analyzed all of the evidence of record, and the consistency between such evidence and plaintiff's subjective allegations.

Finally, plaintiff seems to suggest that the ALJ should have obtained a consultative evaluation.  However, plaintiff merely makes a conclusory statement in this regard, with no citation to authority or rationale for why such an evaluation was required in this case.  It is well-established that an ALJ is not required to seek additional information unless a crucial issue is undeveloped.  <u>Goff v. Barnhart</u>, 421 F.3d 785, 791 (8th Cir. 2005) (citing <u>Stormo</u>,

377 F.3d at 806). There is no indication in this record that the ALJ felt unable to make the decision he did, and substantial evidence supports his decision.

Therefore, for all of the foregoing reasons, on the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed. Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be affirmed.


The parties are advised that they have until March 14, 2013, to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of February, 2013.